And we'll proceed to hear argument in the last case on the calendar, which is 21-16756, Todd Yukutake and David Kikukawa v. Anne Lopez. And this time we will hear first from Nakasuji. Good morning again, your honors. And as you know, my name is Robert Nakasuji. I'm the first deputy solicitor general for the state of Hawaii, and I represent the defendant of Pellant, Hawaii's attorney general. I would like to reserve five minutes for rebuttal, if I may. May it please the court. Your honor, similar to the last case, I would again like to renew our request for a remand to the district court. The motions panel denied our original request and ordered supplemental briefing. But again, your honor, I'd like to point out that the supplemental briefs really touched the tip of the iceberg. There's very extensive historical analysis involved in this issue. And basically the, what happened in the lower court and the original Pellant briefs are largely obsolete as a result of Bruin. And that leaves basically the supplemental briefs for this court to make some very important decisions. So again, I would ask the court to consider remanding. If this court does not want to remand on the merits, this case addresses the constitutionality of two provisions of Hawaii law. One is the 10 day deadline for permits to acquire handguns to be used. The second is the requirement of in-person inspection of firearms at the time of registration. And our position is that both provisions are constitutional. Now we argue, your honor, that there are three historical analogs to the challenge provisions, militia laws, loyalty oaths, and pardons. Militia laws, while militia laws are an affirmative mandate to obtain a weapon, implicit within that mandate is government permission to possess the weapon. Furthermore, your honor, militia laws provided for inspection of firearms. The government officials would inspect the firearms. The results of that inspection would be written down. And that was an early form of registration. Starting with the 10 day permit provision, what purposes does the permit serve apart from background checks? I assume background check is part of the permitting process. What other purposes are served by the permit other than the background check? Well, your honor, the permit ensures that the person is in compliance with Hawaii law. So they pass a background check. You gain this basic information about the person. Are there two background checks? If they buy from an FFL, do they go through two? They go through one in the permit process and then they take the permit to the FFL and they go through another one at the point of sale? I am not entirely sure, your honor, but I believe the way it works is in buying the gun, the permit is, I believe, the person goes to the firearms dealer and then I think the firearms dealer checks with the local officials. And I think the local officials do the actual background check. I don't know the details for sure, your honor, but it happens during that process. The federal check that's done by the FFL, right? I mean, that's going to occur no matter what. So I believe it is done, your honor, but I believe also the state records are checked as well. I think that's all part of the process. I don't know the details on this, your honor, but I believe that these are done as part of the process. Just going back to judge Collins question. I mean, what is really the purpose of giving only 10 days after getting the permit to buy your gun? Because at this point, the permit, they've done the background checks. So make sure they're not a felon. They've given access and mental health records to make sure there aren't any red flags. They've gone undergone their trainings to make sure they can use a firearm. So that's all done. The permit issues. I mean, what purpose is there to say you have to buy the gun within 10 days after that, or you can't, I mean, I don't understand what the purpose of that is. The 10 days there to ensure that that information remains accurate when the gun is actually purchased. You know, there, there are situations. That seems awfully short. 10 days. I understand some of the ripeness, but 10 days seems intended more to inconvenience people rather than make sure it's, it's still valid. Your honor, the 10 days is there to ensure that it's valid. Because if you have a longer period, there's a greater chance of intervening life events happening. The person actually becomes disqualified, but they still have a valid permit to go buy a weapon. Is there, is there any mechanism for within that 10 days that the state would know if someone says, all right, they go through the background check. Then the next day or two days later, person's indicted for, you know. That's the problem, your honor. I mean, it's based on self-reporting. So if you have a longer period, chances are really good that somebody will be disqualified and nobody will know about it. Whereas if you have a shorter deadline, the permit will expire naturally. And so when it expires, the person has to apply for another permit and then the change will be reflected in the, the renewed license, the, the, the, the second application. It seems like there's no real mechanism, even within that 10 days for the state to figure out that person was qualified at day one, but then on disqualified in day 10. I think the 10 days is short enough where you don't need that. But if it were for a longer period, like some of, some states have permits that are good for five years. During five years. Hawaii has one for one year for long arms. Yes. Yes. So which suggests. So a longer period, the risk is greater that somebody is going to get disqualified. You're not going to find out about it unless the person discloses, which is hard to, to assume will happen. Is there anything in the statute that allows someone to get an extension? I don't believe so. Your honor. I think you, you, you simply have to use it within 10 days. If you don't use it, you reapply. But again, if there are changes in your circumstances, it will show up when you reapply. So suppose someone again, gets a permit background check, mental health records, gets a training, gets a permit has 10 days. It's going to go buy it on day five and then day five test positive for COVID has to isolate. So in that case, the person just has to go through the process all over again. Yes, your honor. The person has to reapply. But your honor, if you look at the statistics, 95, 96% of people complete the purchase. It's only about one or 2% that doesn't do it within the 10 days. And then there's another, there's another one or 2% that ends up being disqualified. And that's of course, the reason why you're doing this. You're trying to find the people who get disqualified. So of the regulation is to ensure that the information about being qualified to purchase a firearm is not stale. Why is it one year for much more dangerous? I think when, when the law was passed, I think long guns were regarded as less dangerous. They were primarily considered hunting or target shooting weapons. So I think the danger was handguns because they're concealable. You know, maybe it's time to change that, but that is what the Hawaii legislature decided. And so long guns were allowed for one year and multiple purchases. This approach, your honor, is something that's not unusual. Lots of states have either short single use permits or they have longer term, but multiple use permits. So it's a different kind of approach. Is it private sale, not through an FFL of a long gun? And is the background check for that could be a year old? Yes, possibly your honor. But again, you know, the reason why we have a short deadline for handguns is so that the information isn't stale. It's at worst, it's 10 days old. So again, that's the reason why we have this. And your honor, you know, part of the standard in Bruin is whether it's for an abusive purpose and these purposes are not abusive. We're, you know, we're having these requirements for good reason. And you know, if you apply... Counsel, good reason doesn't seem to cut the mustard with the Supreme Court. What they want is historical analysis and text. So tell me, do we, is there any evidence here of other 10 day waiting periods in colonial times or at the time of the adoption of the 14th amendment? Your honor, we've traced back the 10 day limit to about the 1920s and 30s. But your honor, I think you have to consider that this, this 10 day deadline, it's really an administrative enforcement procedure. It's, it really is not geared toward the real purpose of the permit to acquire. It's really just an implementing procedure. And there is some authority for treating these secondary procedures differently. Bruin itself says that fingerprinting, background checks, training programs, they're okay. As long as the purpose of the regulation is to ensure that only the law abiding responsible citizens have guns. How do you measure that then? I know in general, Bruin rejects balancing, but in, if we're in a footnote nine inquiry where we're trying to assess whether or not the measures that are adopted to implement the ban against prohibited persons that's historically based, what test do we use for that? Is that a means S means ends test similar to like, you know, time, place and manner in the first amendment context? No, your honor means ends is gone, but footnote nine sets the standard. Footnote nine says the regulations have to be narrow and objective and they cannot be for an abusive purpose. What don't die in sites. Um, first amendment permitting cases, um, shuttle's worth and, and can't well. And so can we look by analogy to first amendment cases? Cause you know, there's permitting cases in the first amendment context and we apply both time, place and manner and then specific regulations about, um, discretion, time limits, et cetera. Would those kinds of similar doctrines carry over under footnote nine so that we would look at a similar type of inquiry here? Your honor, that would be a very creative approach. Uh, if this court wants to explore that, I think that's a possibility. But, um, I think our, our, our law will survive that because I think what it ironically would land in, I mean, time place and manner in the first amendment context, um, lands you back in intermediate scrutiny, which is exactly where the court started. Yeah, I understand that your honor. So it could be that this reference to first amendment really is just talking about discretion because you know, under the prior restraint doctrine, discretion is a problem. So they could be simply referring to the lack of discretion. We're also talking about, you know, it's abusive ends, lengthy wait times, exorbitant fees. So they're talking about burdens. And so we're looking at burdens and justifications. And so that's my question about the analogy of the first amendment context. Your honor, again, these are very difficult questions and perhaps remanding to the district court to consider all the ramifications may be a good idea. If not, you know, the footnote nine sets the standard, um, narrow, objective, no abuse of purpose. And I think our, our law satisfies those requirements. Can I shift you for a minute now to the other one, to the five day in person? Yes, your honor. Because here, um, I think you're not quite in footnote nine because I don't see that it ties at all to the prohibited person category because the five day in person has nothing to do with whether the person is a prohibited person. At that point, they already are. They've gone through the permit requirement. They got the permit. They showed up within 10 days. They had another instantaneous check. If they went to an FFL, they have the firearm, not a prohibited person. Now they have to come in and show it. So this is not tied to prohibitive hurt. What is it tied to? What is the purpose and, and what is the how and why that ties in historically on the second one? Well, your honor, the purpose of the inspection is for one thing to ensure that the serial number is properly legible, permanent and accurate. Why, why is the serial, what, what is the interest that is furthered by the requirement of the serial number and recording it and reporting it? Um, that's tied to a historical category under Bruin. Well, your honor, the serial number allows you to trace the weapon and it allows you to tie the weapon to a person who is either a law abiding responsible citizen or is not. So it does ultimately go back to the person. The person has to be law abiding and responsible. Um, and, uh, as far as historically, um, your honor, um, again, Bruin, um, it says that certain procedures are okay. Fingerprinting, background checks, uh, that kind of thing. And this is another one of those procedural mechanisms. It's, it's part of the registration process. It has to be five days. I mean, even if you want to say in person, we've got to see it because we don't really know unless we see the number. What's the justification for five days as opposed to 30 years, as opposed to even six months? I, the five day immediacy seems odd. Well, your honor, the five day is there to ensure that the registration happens in five days. And I think it's there because not everybody is going to be subject to a permit to acquire people coming from out of state. They've already got the weapon. And so they need to register it within five days of arriving. And so I think that is why you're, you're, you're having this requirement to ensure that somebody is aware of the weapon, that the records are recorded. Who just purchased a weapon in Hawaii. We've already, if they've bought from an FFL, we've put them through two background checks. They've cleared both of those. They've been given the firearm. The registration number has in fact been reported by the seller. If it's, if it's a, an FFL. And this is just a triple checking on the number and it has to be in five days. And what justifies that burden? Well, Your Honor, the, you know, the registration requirement is there, I think because, you know, again, there are some people who are not going to be covered by the permit to acquire. There's also other people in private transactions. Again, you're changing. I'm talking about the people who bought weapons in Hawaii. Why is it, what state interest is furthered by having them come in, in five days and not some other time period? Well, I understand the 10 days, the staleness, but I don't understand why it's got to be immediately. We must see that number right away. And what interest furthers that? Your Honor, I think it's again, to make sure that the weapon itself is consistent with Hawaii law. You know, the permitting focuses on the individual and that's all well and good, but an individual may come with a weapon that has something that's,  there are things in Hawaii law that are illegal. Bump stocks, you know, barrel length, you know, you can't have a weapon of a certain barrel length because then it's a sawed off shotgun. Bump stocks, silencers, that kind of thing. And so you're inspecting to see if the weapon is compliant with Hawaii law, along with any other attachments it might have or modifications. And so I think that's the urgency. But again, Your Honor, talking about the inspection itself, that's the reason why we have the inspection. Another question about the registration requirement and the various versions of the law. As I understand the current version that's temporarily in place, anyone who buys their firearm from an FFL is exempt from the registration in person requirement. Am I reading that correctly? Yes, Your Honor. Was that true under the version that was in effect from 2020 to 2022? I believe it was. You read the language and it looks like it could be read that the weapons that are obtained by the FFL don't have to be registered when the FFL takes them. But you could also read it as meaning anything that's sold by the FFL doesn't have to be inspected. The current law seems clear to carve them out, but I'm trying to figure out on that interim version. I believe that if the weapon was registered by a dealer, it did not have to be inspected. I think it was everybody else. When it's sold to a Hawaii citizen. If it was the dealer who was registering it, I think it did not have to be inspected. Okay. Even under the 2022 version? I believe so. But again, you know, the reason why, you know, non-dealers were required to be inspected was very often non-dealers aren't familiar with Hawaii law. So if you have a private transaction, you know, they may be transferring a weapon that's actually illegal. And so the inspection was there to catch that. And again, Your Honor, we think there's a historical basis for that. The militia laws required inspection of weapons. And, you know, back then, you know, there were, there were militia officials inspecting, but fundamentally they're doing the same thing. You're inspecting to ensure that it's in compliance with the law. The law required militia members to have certain kinds of weapons and certain kinds of equipment. Today we're inspecting to ensure that other types of laws are in compliance with, with you know, the, the weapon, you know, again, Bob stocks, barrel length, et cetera. So it's the same idea and it stretches back to the founding era. So basically, Your Honor, we have, we have two, two theories. You know, you, you can, you can look at the direct historical analogs of militia laws, pardons, loyalty oaths. If you do not want to look at those analogs, we have footnote nine of Bruin footnote nine of Bruin says that if your, your regulation is geared toward ensuring that the law abiding responsible citizens have guns and the criminals and the mentally ill do not, well, you can have other procedures, fingerprinting, background checks, and our procedures here are similar to those. I think Your Honor, you have to be careful to make a distinction between the secondary procedures and the underlying basis. And I think if you too closely scrutinize the secondary procedures for one thing, it's inconsistent with Bruin because Bruin just categorically says fingerprinting, background checks, it's okay. But you know, if you, if you subject every single procedure to a historical analysis, a lot of them are going to fail. Fingerprinting, for instance, which Bruin cites fingerprinting didn't exist until the late 19th century, wasn't adopted until the early 20th century. So a lot of these procedures don't have historical analogs, but Bruin doesn't require historical analogs for these procedures. Another example, social security numbers. It's very common to require social security numbers for firearm applications. Social security numbers didn't exist until 1935 when the Social Security Act was passed. Telephone numbers, very common to require a telephone number. Telephones weren't invented until the late 19th century. So you have to make this distinction between the secondary procedures, which are implementing the underlying idea that guns should be limited to the law-abiding responsible citizens. If you don't make that distinction, then you're going to be striking down all kinds of procedures, which really make a lot of sense in the modern world. And you don't have to. Bruin doesn't require striking down a lot of these procedures. And I would argue our procedures here fall in that category. They are implementing procedures. They don't have to comply with that very strict historical pedigree. Again, Your Honor, there's a certain amount of flexibility built into Bruin. All right. Thank you, Counsel. Thank you, Your Honor. Good morning, Your Honors. My name is Alan Beck. I'm Counsel for the Plaintiff Appellants. The matter before this Court is addressed by my friend on the other side, are two of Hawaii's registration laws. In Bruin, the Supreme Court very clearly stated that it is the burdens on the government to affirmatively demonstrate that there is a historical parallel to the laws at issue. Is that clear when we're talking about the footnote nine situation? Because the permitting requirement, it is a tool to ensure that the historically grounded prohibited persons category is being accomplished using modern technology. Background checks were impossible just because telecommunications, communications in general was so poor previously. But now that it's possible to do instantaneous verifications or very rapid verifications of whether someone is a prohibited person, that is now a tool to enforce that historically grounded category. What is the standards as you understand it under Bruin and footnote nine for evaluating those kinds of measures to implement that historically based prohibited persons category? Yes, Your Honor. I'm not suggesting that something that life instantaneous background check like the NICS system is something that should be struck post Bruin. And again, I would go to the how and why of why something was placed. There absolutely were laws that prohibited felons and other categories. Isn't that what this permitting regime does? It implements a background check. Now maybe it's duplicative with respect to those who then buy from an FFL, but for those who don't buy from an FFL, doesn't it ensure that there's a background check in connection with that purchase? It's in the, we aren't the permit to acquire. Arguably the permit to acquire itself is during that. And in this litigation, we have not challenged the validity of simply the basic permit to acquire. What we are implementing is these two extremely onerous requirements. What's the standard for judging the onerousness of it? Because it doesn't seem to me that, or tell me if you think I'm wrong, it doesn't seem to me that that inquiry is a historically based inquiry. It seems to be a footnote nine, assess the burdens and the only hint I see from footnote nine, how to do that are references to first amendment cases. And so my question to you is the same as to your opponent, which is, do we look to first amendment standards for assessing whether something is too onerous? We have tests in the permitting context in the first amendment where it's a combination of the sort of time, place and manner restrictions, and then special restrictions about permits, about discretion, length of time. Would those be the kinds of doctrines we would now carry over for assessing background checks? No, your honor. I, um, we've, um, it was judge Sykes on the seventh circuit actually recently in a felon possession case, uh, reference the second amendment as now a supercharged right, uh, post beer and as a supercharged right, uh, Diana Sykes from the seventh circuit. And I, I, you know, I, um, and I, I think, uh, just going with what judge Sykes say, uh, the Supreme court very clearly has said that, uh, you know, first amendment doctrine, you know, the interest balancing, which is part of first amendment doctrine simply isn't applicable here. So I would suggest this court did. The whole comment in Bruin that the categorical approach applies and an interest balancing is out is done entirely by reference to first amendment cases saying we have historically based categorical exceptions from the first amendment. Um, and that's where they draw the analogy. So if they're getting that rule that we have to have historically based tests, from first amendment jurisprudence, why would this other aspect of first amendment jurisprudence supply, especially when in footnote nine, they again cite the first amendment. Um, as a initial matter, I was surprised I've discussed the first amendment five year again, judge Collins. But, uh, um, no, I mean, this is why, um, the, um, what we need, I think the better approach to apply Bruin, um, um, accurately is to demonstrate that, um, is you look at the historical burden. Okay. So you have a regulation that achieves purpose at 1791. Now you've got a modern day law that achieves the same purpose. We look to see whether this law has the same burden that, uh, those historical laws were. And here's an example of that. In Jackson V San Francisco, Judge Ikuda discuss the gunpowder storage requirements. That's an example of how, uh, you can analogize properly to, uh, colonial laws and, uh, that achieve the same purpose. There's not going to be any colonial laws about background checks because they were technologically infeasible. And so now that we've got this new tool, given we live in a more advanced technologically society, we've now got this new tool for implementing the historically based prohibited persons category. And so now we need to evaluate how the tool can be used. What are the standards for that? It can't be history because we can't get it from history. It didn't exist. What I'm suggesting is that we look and see if a modern day regulation has a comparable burden to something that 1791 achieved the same purpose. And this is the difference, what we're dealing with right now and say the instantaneous background check this court's alluding to right now. Um, what's the burden of going into a gun store, filling out your 4473 and having a instantaneous background check? Um, I think that's something that during the colonial era, you know, I don't think anyone would have said, you know, a very short, you know, 20 minute delay is anything that's really burdening my ability to go pick up a firearm. Here, this is much distinguishable because we have the system that is,  so I, you're understanding that if a Hawaii citizen buys a firearm from an FFL that they go through two background checks, one for the permit and one at the FFL. Uh, yes, Your Honor. Okay. But, um, as to those who don't buy from FFLs, the permit is the only background check. Um, I believe so. Yes, Your Honor. Okay. So then the permit does seem to be tied to the background check process and then it's just a question of, is 10 days too much of a burden? That's one way of looking at it. Yes. I mean, yeah. I mean, when you go, yeah, the background checks with the permit to acquire, Your Honor. Okay. And so how do we, in your view, assess, what are the legal standards for assessing the burden of the 10 day versus another period? What, what's the doctrinal formula that, um, we use for that? Well, I mean, I think what, uh, as I said, I think that what we do is we look to couple burdens during the appropriate historical era. You know, I think that's being 1791 and, you know, we look, you know, uh, for example, we can, um, we could look to the, um, gun storage law. I'm sure that there were other comparable things that you had to engage in that, uh, when dealing with large amounts of gunpowder, say in Boston and, you know, whatever that, you know, permitting process is, you know, you can apply something similar to that with a similar amount of, uh, difficulty, uh, to the modern laws. Um, uh, again, so the issue I'm having in, say, in the Pacifics is ultimately though the burden of the duty is on the state of why it produced those historical analogs, which is why they don't do that here. They've listed three things, none of which are, um, in a shape, way or form, uh, close to, uh, three things that they used, at least with respect to the 10 day provision of all related to justifying background checks. But we seem to all agree that background checks are not called into question by Bruin. And it's just a question of what Bruin tells us are the standards for assessing the burden involved in the background check process in footnote nine. And I don't see that that's historically based. I mean, I, again, I disagree. I mean, Bruin makes it very clear that you need to affirmatively, they need to produce affirmative, uh, historical data. And I think the best way to interpret this is to look at the historical, the comparable historical burdens at 1791. And that's how you demonstrate analogousness. Um, you know, another case where the courts use analogical reasoning, um, to, uh, TransUnion v. Ramirez is a standing case and, uh, uh, they were trying to determine, uh, what was the concreteness in, uh, and they look to see what is happening at 1791. And I'm saying is that what the court should first, obviously we believe the court should, um, strike these two laws. And in doing so, the methodology this court should imply, employ is one that says the burden is on the government to find a comparable burden at 1791. And I think that if this court would do so, that would not be putting in danger, um, instant background checks. It wouldn't be putting in danger the vast amount permitting in the continental United States because, you know, at 1791, I really don't think that, uh, the historical record would say that anyone would have an issue of going in, you know, for 20 minutes to, um, you know, to wait for 20, 30 minutes on a background check. In fact, I point to this court's opinion in Tekshira, uh, where they talked about the long delays in, um, acquiring a firearm just simply due to the logistical issues associated with that. And, you know, um, I think what this court shouldn't be doing right after Buren, right after getting rid of the interest balancing, I think we have a duty to take the Supreme Court, uh, at its word and, you know, not, you know, just simply come back and come up with another form of interest balancing just because that's something that is convenient. I mean, what should we do with Justice Kavanaugh's concurrence in Buren? I think the Chief Justice joined that as just ignore it as a non-binding concurrence or does it provide some, uh, guidelines for us? Yes, Your Honor. I mean, I think that, uh, Justice Kavanaugh all Justice Kavanaugh is saying is here are a list of things that still would be constitutional in my opinion afterwards. And, you know, I mean, that's, he's, that's, he didn't say that to, uh, change the methodology that need to be employed from the majority opinion. This is just simply him stating that, uh, you know, the world's not going to end post Buren. Here's a list of things that are based upon, um, my analysis are not going to change that. That doesn't mean that we need to import first amendment doctrine to this. Can we talk about the registration provision? So as this case comes to us, you're not challenging the requirement that they register the gun and provide a serial number. No, I am not. Okay. So what do you understand to be the valid basis on which that registration requirement is based? Uh, that's not something that we formulate an opinion on in this litigation. I mean, we're solely, uh, dealing with the two. Um, I know, but you're not challenging it, but yet we have to assess a, uh, a restriction or a burden that arises in connection with it. And it's kind of important in assessing that burden to know what it is that justifies that system. And you can see that it's justified or you're not challenging it. What is that based on? And what is the interest that's at issue in the registration side of it? Um, that ties it to a historically based category that we then can assess, um, whether this is too and inappropriate. So, I mean, we're talking about basic registration itself. I mean, uh, uh, the bottom line is, uh, is that during the colonial era, there were people that were prohibited from, um, uh, owning firearms. Um, you know, um, I, I, I think, uh, Judge Bumate's, um, dissent in, uh, the, as we, my case discusses, uh, uh, uh, large history of mentally ill people, uh, felons, of course, or at least violent felons or common law felons. And I think that that's what basic registration is doing is, um, making sure that, um, uh, those we could, you could justify that because it's not a big burden, uh, to, um, uh, compared to the colonial era. And, but it's just, do you see the registration requirement as, um, being tied to the privileged person's rationale? Yes, Your Honor. How did, how does it further that? Well, um, it's the, you know, it's just tied in with the background check provisions, Your Honor. Yeah. It's, uh, I, I'd like to just very briefly, uh, discuss, uh, a remand. A remand was unnecessary in, uh, Bruin and that was on 12B6. And, uh, the, uh, my, um, friend on the other side suggestion that, uh, this needs to be remanded in order to, um, uh, develop a better record. It's just, uh, not accurate, especially in light of the fact that this was on summary judgment and, uh, there was a, um, a very wide historical record with Judge Seabright actually expressed the issue of a ruling on it. Um, so are, are there any further questions, Your Honor? Uh, that, I'll cede the rest of my time. Thank you very much, Your Honor. Okay. Thank you, counsel. I'll give you three minutes for rebuttal. We took a lot of time with questions. I'll give you three minutes. Thank you, Your Honor. Uh, Your Honor, I, I believe we, we are on the same page on this. I think, um, I think the court is wrestling with a very important issue. You know, what's the basis for, uh, a lot of these, um, concepts. And I think, uh, you know, I think it's clear that militia laws provide some historical analog, especially for registration, for instance, but also this idea of historically grounded prohibited persons. You know, this issue has really been litigated a lot. Um, and, uh, you know, there are historical bases for prohibiting certain people from having guns. Uh, there's the civic virtue theory, uh, in the common law era, certain people were deemed to be unvirtuous citizens. And so they couldn't own guns. And a lot of second amendment scholars have explored that. There are a lot of cases that have relied on it. The Vonce case in the Ninth Circuit, Yancey, Binderup, um, and then, uh, Justice Amy Coney Barrett also explored this idea. She modified it a little bit. She said it's more dangerousness, not so much civic virtue. Um, but regardless of what your theory is, um, it's clear that there is a historical basis for prohibiting certain people from having guns. And that's what our law does. Our, our, these two laws, they try to prevent the criminals and the mentally ill from having guns. And it's done through certain procedural mechanisms. And as Justice Kavanaugh pointed out in his concurrence, these procedural mechanisms are okay. You know, fingerprinting, background checks, training programs, they have to be okay. Otherwise, you know, in the modern world, you couldn't stop certain people from having guns if they're dangerous. So I think what the court is wrestling with is very, very important. And again, if the court wants to remand, we can explore this with the district court. If not, uh, I think the court, your honors, I think you're, you're looking at this in what I believe is the correct way. And so the question is, you know, what kind of standard do you impose for these procedural mechanisms? Well, I think what we're left with is footnote nine. Footnote nine says, uh, narrow objective, not for an abusive purpose. I think we're, we're stuck with that. And, you know, in dealing with whether this is for an abusive purpose, I think you have to consider what the purposes are. And I've explained the purposes of these procedures and I think they are legitimate. They are not abusive. Um, and based on that, you know, I would argue that the court should affirm these procedures because they're, they're not abusive. Uh, and they're also narrow and, and objective. So, uh, based on footnote nine, your honor, I think the argument is very strong for upholding these procedures. If not footnote nine, look at the direct analogs, the militia laws, the pardons, the loyalty oaths, but either, either theory that the court, you know, accepts, I think they're legitimate theories and I think they support our, our laws. Thank you. All right. Thank you. I'd like to thank both counsel for your very helpful arguments in both of these cases and the case just argued is submitted and we are in recess for today.
judges: BEA, COLLINS, LEE